LAW OFFICES OF SHELLEY M. LIBERTO
SHELLEY M. LIBERTO (132304)
3 Hutton Center Drive, Suite 900
Santa Ana, California  92707
Tel:  (714) 668-0700
Fax: (714) 424-9556

Attorneys for Defendants, GUBA LLC,
a Delaware Limited Liability Company;
THOMAS G. MCINERNEY, JR.; and
ERIC LAMBRECHT

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PERFECT 10, INC., a California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>GUBA LLC, a limited liability company; THOMAS G. MCINERNEY, JR.; AND ERIC LAMBRECHT,<br><br>Defendants. | CASE NO.  C 02-2842 (MMC)<br>The Honorable Maxine M. Chesney<br><br>**GUBA'S REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Fed.R.Civ.P. 56]<br><br>Date:     December 20, 2002<br>Time:    9:00 a.m.<br>Ctrm.:    7 |

**TABLE OF CONTENTS**

**Page**

1. **Summary of Reply** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

2. **The Factual Distinction Between Primary Infringing Activity and Secondary Copying in the On-Line Context Is Crucial to an Analysis of Liability for On-Line Service Providers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

   A. **Case Law Consistently Distinguishes the Culpable *Primary Infringer* from On-Line Service Providers Who Merely Do Business on the Internet** . . . . . **6**

   B. **Because GUBA Has No Relationship with Persons Who Initiate Infringement on the Internet, It Is Much Farther Removed from Liability than Defendants in the *Netcom* Line of Cases** . . . . . . . . . . . . . . . . **8**

   C. **The *CoStar* Case Best Demonstrates the Absence of Direct Infringement Liability Notwithstanding the Uploading of Images from the Usenet** . . . . . . . . **9**

3. ***WebbWorld* Is Not a "Leading Case" in On-Line Copyright Law** . . . . . . . . . . . . . . . . . **10**

4. **The Newsgroup Name "Magscans" Is Not "Obvious and Conspicuous" Information Giving Notice that Perfect 10's Images Are Contained Therein** . . . . . . . . **11**

5. **GUBA Is in Substantial Compliance with the DMCA So as to Allow the Safe Harbor of Section 512(d)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

6. **A "Fair Use" Defense for the Use of Thumbnails Is Appropriate Under *Kelly*** . . . . . . **15**

7. **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

# TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page(s)**

**A & M Records v. Napster**, 239 F.3d 1004, 1023 (9th Cir. 2000) ........................ 7

**ALS Scan v. Remarq Communities**, 239 F.3d 619, 620 (4th Cir. 2001) .............. 7, 11-13

**CoStar Group v. Loopnet, Inc.**, 164 F.Supp.2d 688 (D.Md. 2001) .............. 4, 5, 9-12, 15

**Ellison v. Robertson and America On-Line**
       189 F.Supp.2d 1051, 1062 (C.D.Cal. 2002) .......................... 7, 8, 11, 12, 15

**Hendrickson v. Ebay**, 165 F.Supp.2d 1082, 1083-84, 1087 (C.D.Cal. 2001) ................. 8

**Marobie-FL v. National Assn. of Fire Equipment Distributors**
       983 F.Supp.1167 (N.D.Ill. 1997) ................................................ 8

**Playboy Enterprises v. WebbWorld**, 991 F.Supp. 543, 553 (N.D. Tex. 1997) ........... 10, 11

**Religious Technology Center v. Netcom On-Line Communication Services**
       907 F.Supp. 1361, 1372 (N.D.Cal. 1995) ................................ 4-11, 15


**Statutes**

**17 U.S.C. § 512(k)(1)(B)** .................................................................. 12

**17 U.S.C. § 512(n)** ........................................................................ 14


**Other Authority**

**3-12A Nimmer on Copyright § 12A.01[C]** ................................................. 6

**3-12B Nimmer on Copyright § 12B.01[A] fn. 70** ......................................... 10

**3-12B Nimmer on Copyright § 12B.05[B][1]** ............................................. 12

**3-12B Nimmer on Copyright § 12B.06[A]** ................................................ 14

**H.R.Rep. 105-551(I 7/22/98) pp. 57-58** ................................................. 12

**H.R.Rep. 105-551 (I 5/22/98) p. 57** .................................................... 14

Defendants GUBA LLC, Thomas G. McInerney, Jr. and Eric Lambrecht hereby submit their Reply to Plaintiff Perfect 10's Opposition to Defendants' Motion for Summary Judgment or in the alternative for Partial Summary Judgment.

**2.      Summary of Reply.**

Perfect 10 continues to resist the fundamental distinction between primary infringing activity on the Internet at the root level, and the inevitable secondary copying by on-line service providers that necessarily results from that activity. This distinction is the common thread among all modern on-line copyright liability cases as well as the DMCA. To ignore it can only lead to anomalous results inconsistent with on-line law and policy. By simply stating that GUBA copied Perfect 10's image and nothing more does not relegate GUBA to the status of a direct infringer. Every on-line service provider named as a defendant has in some ways "copied" material placed on the Internet by a third party and yet is not automatically found liable for *direct infringement*.

Perfect 10 argues that the *Netcom* exemption for direct infringement applies only to service providers whose members initiated the infringing activity. It argues that because GUBA's software automatically posted the images on GUBA's Web site, GUBA itself is the primary infringer and the rule in *Netcom* does not apply. This, although the images were first placed on the Usenet by third parties, thereby exposing the images to automatic and multiple copying throughout the Worldwide Web. The argument unreasonably confines current policy derived from *Netcom* to the specific facts of that case, and ignores the foreseeable evolution of the rule to accommodate the new and different fact patterns that the Internet has spawned since 1995. Furthermore, modern on-line case law has expanded the basic principles of *Netcom* beyond the very narrow set of facts that Perfect 10 attempts to force upon the court.

Specifically, in the case of *CoStar v. Loopnet*[1], the District Court applied the rule in *Netcom* to grant summary judgment in favor of the operators of a Web site, like GUBA, on the issue of direct infringement. In *CoStar*, defendant operated a Web site containing real estate information to serve buyers and brokers. Defendant Loopnet accepted and previewed photographs of properties, placed

---

[1]     CoStar Group v. Loopnet, Inc., 164 F.Supp.2d 688 (D.Md. 2001).

1  them in files, and then uploaded them onto its own Web site without knowing that the images were
2  plaintiff's protected material.  This case extinguishes Perfect 10's argument that GUBA is not entitled
3  to summary judgment on the direct infringement issue under *Netcom* because GUBA uploaded and
4  stored images from the Usenet.  The *CoStar* case also demonstrates how the rule in *Netcom* must
5  evolve to accommodate new technologies and the sense of Congress reflected in extensive research
6  and the creation of the DMCA.  Both of these elements were missing in the *WebbWorld* case.

7        The lone *WebbWorld* case upon which Perfect 10 rests its entire argument for direct copyright
8  infringement is hardly a "leading case" as dubbed by Perfect 10.[2]  Nimmer, not insignificantly,
9  categorizes *WebbWorld* as a pre-DMCA case.[3]  *WebbWorld* also entailed a *non-cooperating* on-line
10 service provider who violated a TRO, failed to institute adequate technological means to filter out
11 Playboy's images, and drew content from newsgroups containing the name of plaintiff's company in
12 the newsgroup.  Furthermore, in light of the dearth of analysis that the *WebbWorld* court afforded
13 *Netcom*, and its conclusionary nature, this court cannot base its decision on this single extra-
14 jurisdictional case.

15       With regard to Perfect 10's attempt to raise a triable issue as to GUBA's "knowledge," the
16 court should be alerted to a sleight of hand so as to avoid error.  Perfect 10 argues that because the
17 *images comprising the content* of the newsgroups reveal Perfect 10's ownership at "one glance,"
18 GUBA should be charged with knowledge of infringing activity.[4]  Facts are undisputed, however,
19 that GUBA's process is entirely automatic and entails absolutely no pre-screening of the contents of
20 any newsgroup that GUBA archives.  Furthermore, because the newsgroups archived by GUBA do
21 not contain tell-tale information that could alert GUBA to the infringement of Perfect 10's material,
22 facts remain undisputed that GUBA had no knowledge of the existence of Perfect 10's images in its
23 archive.  In any event, the "knowledge" issue goes only to one of the two elements of liability for
24 *contributory infringement*.

---

26   [2]    Perfect 10 Opposition, 6:9.

27   [3]    3-12B Nimmer on Copyright § 12B.01[A] fn. 70.

28   [4]    Id. at 21:20-22, 22:1.

1        Finally, contrary to Perfect 10's position, asserted without authority, GUBA does qualify for
2   the DMCA exemption because it meets the very broad definition of a "service provider." GUBA is
3   certainly an information location tool as defined by the DMCA, and it has substantially complied
4   with the agency registration requirement. The rule in *ALS Scan* dictates that substantial compliance
5   with the notice requirements of the DMCA is adequate when parties acknowledge actual notice.
6        In the interest of convenience to the Court and the parties, GUBA will cross-reference its
7   Motion for Summary Judgment ("GUBA's MSJ"), and its Opposition to Perfect 10's Motion for
8   Summary Judgment filed concurrently ("GUBA's Opp. MSJ"), which are hereby incorporated by this
9   reference.

10  **3.   The Factual Distinction Between Primary Infringing Activity and Secondary Copying in**
11  **the On-Line Context Is Crucial to an Analysis of Liability for On-Line Service**
12  **Providers.**

13       **A.   Case Law Consistently Distinguishes the Culpable *Primary Infringer* from On-**
14  **Line Service Providers Who Merely Do Business on the Internet.**

15       Perfect 10 insists that GUBA is liable for "direct infringement" because it copied Perfect 10
16  images. Such a conclusion is simplistic and ignores the very core of the analysis set out in *Netcom*,
17  its progeny and the DMCA. Once a document or image is launched into the Worldwide Web, by the
18  very nature of the operation of the Internet, it is repeatedly "copied" and sent to reside on Usenet
19  servers, the servers of Internet service providers, and anyone who happens to access the information
20  from any of those locations regardless of their relationship with the primary infringing activity. As
21  acknowledged by Nimmer:

22  > *That line of cases reaches a new crescendo in the Net environment. If*
23  > *machinery that allows copying is subject to challenge, then the Internet*
    > *as a whole may be at risk. For the Internet itself, on one tendentious*
    > *view at least, is "nothing other than one gigantic copying machine."*[5]
24

25       To charge simply that GUBA "copied" is not enough to find liability for *direct infringement*.
26  Facts are undisputed that GUBA did not initiate the infringing activity at the root level. GUBA is not
27  the typical *primary infringer* that has been found liable for direct infringement throughout case law,

28      [5]   3-12A Nimmer on Copyright § 12A.01[C].

wherein the on-line service provider is left to be analyzed under theories of secondary contributory and vicarious infringement.

For example, the concept of "primary infringer" is acknowledged by the Ninth Circuit when it comments on the reluctance of Cherry Auction to supervise the sale of bootlegged videotapes at its swap meet in the *Fonovisa* matter.[6]  More on point, the court in *Ellison v. Robertson/AOL* granted summary judgment in favor of on-line service provider AOL by concluding:

> *By contrast, AOL had no such ability to go after Robertson personally here.  Rather, it found itself in the same situation as every other ISP in the world that had entered into peer agreements which included the alt.binaries.e-book newsgroup.  It could delete or block users' access to the infringing postings, but <u>it could not do anything to restrict the infringing activity at the root level</u>.*[7]

Harking back to *Netcom*, the *Ellison* court also states:

> *While the <u>Netcom</u> court left open the possibility that an ISP with USENET messages on its servers might be guilty of contributory infringement under certain circumstances, it held that direct infringement liability <u>should be limited to those users, like Robertson, who are responsible for the actual copying</u>.*[8]

And reverting to the seminal case, the court in *Netcom* concluded:

> *Where the infringing subscriber is clearly directly liable for the same act, it does not make sense to adopt a rule that could lead to the liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet.  <u>Such a result is unnecessary as there is already a party directly liable for causing the copies to be made</u>.*[9]

> *<u>Only the subscriber should be liable for causing the distribution of Plaintiff's work</u>, as the contributing actions of the BBS provider are automatic and indiscriminate.*[10]

GUBA is met with the same challenge as AOL.  It can do no more than delete or block its

---

[6]  <u>A & M Records v. Napster</u>, 239 F.3d 1004, 1023  (9th Cir. 2000) (citing *Fonovisa*).

[7]  <u>Ellison v. Robertson and America On-Line</u>, 189 F.Supp.2d 1051, 1062  (C.D.Cal. 2002).

[8]  <u>Id</u>. at 1057.

[9]  <u>Religious Technology Center v. Netcom On-Line Communication Services</u>, 907 F.Supp. 1361, 1372  (N.D.Cal. 1995).

[10]  <u>Id</u>. at 1372.

1  own users' access to infringing postings once given notice. It can do nothing to restrict the infringing
2  activity at the root level on the Usenet. Likewise, the court in Hendrickson v. Ebay also expressly
3  distinguishes "secondary liability" for copyright infringement of an on-line service provider's
4  sellers.[11]

The distinction between primary infringing activity at the "root level" and secondary copying is more than merely nominal. A survey of the cases reveals that direct infringement liability for on-line service providers does not lie unless the on-line service provider <u>itself</u> initiated the infringing activity on the Internet. In the *Kelly* case, discussion of the *Netcom* exemption for direct infringement is conspicuously absent because Arriba Soft was a primary infringer. Arriba Soft initiated the copying of plaintiff Kelly's images onto its own Web site.[12] Likewise in the *Marobie-FL* case, the primary infringer was found liable for direct infringement because it copied plaintiff's clip-art onto its Web site. The on-line service provider, however, was found not liable for direct infringement under the rule in *Netcom*.[13] In the *Ellison v. AOL* case, defendant Robertson was the primary infringer, while AOL was found not liable for direct infringement. In the *Netcom* matter itself, defendant Ehrlich was the primary infringer, while *Netcom* was found not liable for direct infringement. In the *Hendrickson v. Ebay* matter, defendant Durham was the primary infringer, while Ebay was found not liable for direct infringement. Unless an on-line service provider is the primary infringer who first illicitly copies the material onto the Internet at the "root level," it cannot, therefore, be held liable for direct infringement.

**B.    Because GUBA Has No Relationship with Persons Who Initiate Infringement on the Internet, It Is Much Farther Removed from Liability than Defendants in the *Netcom* Line of Cases**.

Perfect 10 attempts a rhetorical shortcut by likening GUBA to the primary infringing

---

[11]   Hendrickson v. Ebay, 165 F.Supp.2d 1082, 1083-84, 1087 (C.D.Cal. 2001).

[12]   GUBA Opp. MSJ, 11:14.

[13]   Marobie-FL v. National Assn. of Fire Equipment Distributors, 983 F.Supp.1167 (N.D.Ill. 1997).

1  "members" of on-line service providers like *Netcom*. It argues that because GUBA has no members,
2  that GUBA itself must necessarily assume the role of the primary infringer for liability purposes.
3  This argument is not only unfair, but makes no sense. The fact that GUBA has no relationship at all
4  with any possible primary infringer does not thereby make it one. On the contrary, the fact that it
5  accepts no fee from any member who could initiate infringing activity on the Internet through its
6  Web site, greatly distances GUBA from the primary infringing activity and direct infringement
7  liability. GUBA does nothing more than organize and index material that is already placed on the
8  Usenet by unknown third parties. It cannot by any stretch of the imagination be associated with the
9  root activity that caused Perfect 10's images to be placed on the Usenet in the first place. On the
10 other hand, facts are undisputed that Perfect 10 itself places its "sole asset," the images that it now
11 claims have been illegitimately copied, onto the Internet itself on its own Web site, thereby exposing
12 it to quick and simple infringement by its own members.

  **C.**  **The *CoStar* Case Best Demonstrates the Absence of Direct Infringement Liability Notwithstanding the Uploading of Images from the Usenet**.

In *CoStar Group v. Loopnet*[14], the court granted summary judgment in favor of an on-line service provider that hosted a real estate Web site on behalf of its members who were real estate professionals. Loopnet's members, the *primary infringers*, copied and submitted plaintiff's photographs of real estate to defendant CoStar for placement on its Web site. CoStar took possession of the infringing material, previewed it, placed it in specific files and uploaded 300 copyrighted photographs onto its Web site. *The photographs were stored and displayed at the direction of defendant Loopnet.* Most notably, Loopnet did not operate "without human intervention as a passive conduit for copyrighted material" as would have been required under a narrow reading of *Netcom*. Nor was Loopnet's activity "passive, automatic acts engaged in through a technological process

---

[14] CoStar Group v. Loopnet, 164 F.Supp.2d 688 (D.Md. 2001).

1  initiated by another" as described in the DMCA.[15]  The court concluded point-blank that, based on
2  *Netcom*, "the case does not present a valid claim of direct copyright infringement."[16]

3  Because of the vast diversity of technology on the Internet, the evolution of which cannot
4  even be foretold at this point, it would be a mistake to read and apply *Netcom* to the narrow set of
5  facts that existed in 1995.  Bulletin board systems ("BBS") as referred to in *Netcom* are rarely used
6  anymore.  Just as the *CoStar* court has adapted the fundamental principles of both *Netcom* and the
7  DMCA to real, current day problems that arise from doing business on the Internet, so too should this
8  court reject an unreasonably strict application of the *Netcom* fact pattern.

**4.     *WebbWorld* Is Not a "Leading Case" in On-Line Copyright Law.**

Perfect 10's compulsive over-citation of the *WebbWorld* case is its only glimmer of authority that a Usenet archival service should be held liable for direct infringement.  *WebbWorld,* however, was decided pre-DMCA, a point found to be significant by Nimmer.[17]  The *WebbWorld* court did not, therefore, benefit from the depth and breadth of the legislative intent of the DMCA expressed by Congress.  *WebbWorld* is highly distinguishable on the facts as well.  The defendant was a *non-cooperating* on-line service provider who violated a TRO to refrain from posting images belonging to Playboy Enterprises.[18]  Unlike GUBA, WebbWorld derived its content from newsgroups containing obviously infringing content such as "alt.sex.playboy" and "alt.mag.playboy."[19]  Furthermore, defendant failed to develop technology such as GUBA's that could detect, filter out and remove protected material, cited by the court as a ground for direct liability.[20]  More important, however, is the disappointing fact that the *WebbWorld* opinion is unduly conclusionary and markedly short on analysis.  The court gives no explanation as to why an on-line archival service should not be held

---

[15]   Id. at 695-696.

[16]   Id. at 696.

[17]   3-12B Nimmer on Copyright § 12B.01[A] fn. 70.

[18]   Playboy Enterprises v. WebbWorld, 991 F.Supp. 543, 553 (N.D. Tex. 1997).

[19]   Id. at 552-553.

[20]   Id. at 554; GUBA's Opp. to MSJ, 9-11.

1  exempt from direct infringement liability given the rationale in *Netcom*. The court does nothing

2  more than distinguish *Netcom* on non-material facts. This court should therefore avoid the

3  temptation to adopt the *WebbWorld* ruling in light of the extensive body of law that has since

4  transpired, including the ruling in *CoStar*.

5  **5.     The Newsgroup Name "Magscans" Is Not "Obvious and Conspicuous" Information
        Giving Notice that Perfect 10's Images Are Contained Therein.**

7  Perfect 10 seems to assert that because some of the archived newgroups contained the word

8  "magscans," that GUBA was on prior notice that Perfect 10's images were contained therein.[21] This

9  would go to the knowledge requirement of contributory infringement. First, the term "magscans"

10 gives no hint that the contents of that newsgroup contain Perfect 10 images. This is highly

11 distinguishable from the other cases attributing knowledge to on-line service providers based on

12 newsgroup names. For example, in *ALS Scan*, the newsgroup name contained plaintiff's own name:

13 "alt.<u>als</u>" and "alt.binaries.pictures.erotica.<u>als</u>."[22] Likewise, in the *WebbWorld* case, the newsgroup

14 names contained the word "Playboy."[23] In contrast, in the *Ellison v. AOL* matter, defendant was <u>not</u>

15 now charged with "knowledge" of the contents of a newsgroup entitled "alt.binaries.e-book" which

16 plaintiff alleged "obviously" gave notice of infringing content comprised of copied books. In any

17 event, neither a newsgroup's <u>name</u>, nor even the <u>contents</u> necessarily attribute "knowledge" for

18 contributory infringement purposes. Nimmer states:

19 > *What if a human cataloguer comes across a site boldly proclaiming
> itself to be "pirate's lair" or "bootleg heaven" or "copyright*
20 > *infringement central?" It might be argued that because the infringing
> nature of such sites would be apparent from even a brief and casual*
21 > *viewing, safe harbor status for a provider that views such a site and
> then establishes a link to it would not be appropriate. But that*
22 > *conclusion might be too facile. For any of those sites might in fact be
> unrelated to copyright infringement – or might by contrast document*
23 > *the efforts of proprietors to snuff out piracy that they have located. The
> possibilities are endless – this writer elsewhere sets out a wealth of*

---

[21]  GUBA did not create a category named "magscans" as asserted by Perfect 10. "Magscans" is the name of a newsgroup archived by GUBA. Lambrecht Opp. Decl. ¶ 4.

[22]  <u>ALS Scan v. Remarq Communities</u>, 239 F.3d 619, 620 (4th Cir. 2001).

[23]  <u>Playboy v. WebbWorld</u>, *supra*, 968 F.Supp. at 552, 553.

> *potential cases as a means of testing the boundaries of red flags, concluding that the terrain is extraordinarily difficult to map. These divergent examples show that some conduct would fall within the exemption, and other conduct without. Congress thereby intends to "strike the right balance" between copyright owners and service providers.*[24]

Finally, beyond the assertion that the newsgroup name "magscans" indicates that Perfect 10's images are located therein, Perfect 10 attempts to charge GUBA with knowledge of the *contents* of the newsgroup itself.[25] Facts are undisputed, however, that GUBA did not, and could not have reviewed the contents of any newsgroup because its entire archiving process is automatic and indiscriminate. The nature of the contents of the newsgroups archived by GUBA are, therefore, absolutely irrelevant for purposes of imputing the requisite knowledge for contributory infringement to GUBA. The only reasonable solution to the knowledge issue is simple DMCA-style notice that protected images have found their way into GUBA's archive.

**6.     GUBA Is in Substantial Compliance with the DMCA So as to Allow the Safe Harbor of Section 512(d)**.

First, GUBA easily falls within the definition of a "service provider" which includes a provider of on-line services who is simply "a provider of on-line services or network access, or the operator of facilities therefor . . ."[26] On its face, the statute includes GUBA. In any event, the definition is to be read broadly.[27] Furthermore, the *ALS Scan* case makes clear that *substantial compliance* with the agency registration provision of the DMCA is adequate if the parties acknowledge receipt of actual notice.

In *ALS Scan*, the court denied the DMCA safe harbor provision to defendant because plaintiff had given adequate, although imperfect notice of infringement. ALS Scan had notified defendant

---

[24] 3-12B Nimmer on Copyright § 12B.05[B][1]; *see* H.R.Rep. 105-551(I 7/22/98) pp. 57-58 ("obvious and conspicuous circumstances" required to impute knowledge).

[25] Perfect 10 Opp. to MSJ, 21:20-22, 22:1-2 ("One glance at the images GUBA copied reveals that they are Perfect 10 material . . .").

[26] 17 U.S.C. § 512(k)(1)(B).

[27] CoStar, *supra*, 164 F.Supp.2d at 701 (*citing ALS Scan*).

1  Remarq of the "alt-binaries.pictures.erotica.als" and "alt.als" newsgroups as obviously containing
2  ALS copyrighted images.  This was so because the names of the newsgroups themselves contained
3  the name "ALS."  The newsgroups contained virtually all federally copyrighted images.[28]   ALS Scan
4  placed Remarq on notice not only of the newsgroups to which it was providing access, but also the
5  specific location on the Web where Remarq could identify the specific images in dispute.  The court
6  stated:

> *In the spirit of achieving a balance between the responsibilities of the service provider and the copyright owner, the DMCA requires that a copyright owner put the service provider on notice in a detailed manner but allows notice by means that comport with the prescribed format only "substantially" rather than "perfectly."*[29]

10  The court therefore concluded that substantial compliance was adequate when it placed the
11  defendant on actual notice of infringement.  In our case, GUBA has substantially complied with the
12  registration requirements of Section 312(d)(3) by filing an Interim Designation of Agent as
13  required.[30]  Under the rule in *ALS Scan*, such substantial compliance is adequate because, as a matter
14  of undisputed fact, Perfect 10 was able to locate GUBA for the purpose of lodging a complaint of
15  infringement by virtue of the instructions place on GUBA's Web site, and Perfect 10's actual use of
16  GUBA's e-mail notification system as used by APIC to notify GUBA of Perfect 10's images.[31]
17  With regard to Perfect 10's assertion that GUBA does not substantively fall into the category
18  of an information location tool, the statute is clear on its face: GUBA is absolved of liability by
19  reason of referring or linking its members to an on-line location by using information location tools,
20  including a directory, index, reference, pointer or hyptertext link.  Perfect 10 seems to assert that
21  referring its users to its own archive somehow disqualifies it from the safe harbor.  On the other hand,
22  the legislative history of Section 512(d) indicates otherwise, by referring specifically to archival
23  services themselves such as GUBA:

---

[28]  ALS Scan, 239 F.3d at 620.

[29]  Ibid. at 625.

[30]  Lambrecht Opp. Decl., ¶ 5, Exhibit 1.

[31]  Lee MSJ Decl., ¶ 7, Exhibit 1.

> *A question has been raised as to whether a service provider would be disqualified from the safe harbor based solely on evidence that it had viewed the infringing Internet site. If so, there is concern that on-line directories <u>prepared by human editors and reviewers, who view and classify various Internet sites</u>, would be denied eligibility to the information location tools safe harbor, in an unintended number of cases and circumstances. This is an important concern because such on-line directories play a valuable role in assisting Internet users to identify and locate the information they seek on the de-centralized and dynamic networks of the Internet.*[32]

Congress would not have so alluded to "on-line directories prepared by human editors and reviewers who view and classify Internet sites" unless it were referring to services substantially like those of GUBA's. There is no authority for Perfect 10's position that Section 512(d) applies <u>only</u> to conventional search engines such as Yahoo! Indeed, "convention" is short lived in the realm of Internet technology.

Finally, simply because GUBA has no membership relationship whatsoever with anyone who could be termed a primary "repeat infringer" cannot operate to disqualify GUBA from Section 512(d). GUBA is so far removed from the primary infringer that no such requirement can possibly be instituted. It would be an unreasonable reading of the statute to require an on-line service provider to terminate subscribers who are repeat infringers when it has none. In any event, Perfect 10 makes citation to Section 512(i), not Section 512(d). Each of the four categories of safe harbor, however, bears its own grounds for determining whether that particular basis for limiting liability pertains.[33] Notwithstanding the absence of the possibility of repeat infringers among GUBA's membership, GUBA <u>does</u> nevertheless comply with the Section 512(i) provision, as anomalous as it may seem, by stating on its Copyright Infringement Page:

> *GUBA reserves the right to remove content from this Web site that appears to infringe the copyright or other intellectual property rights of others. In addition, GUBA may terminate the accounts of users who appear to infringe the copyright or other intellectual property rights of others.*[34]

GUBA has therefore complied with Section 512(d) as much as it possibly can.

---

[32] H.R.Rep. 105-551 (I 5/22/98) p. 57.

[33] 17 U.S.C. § 512(n); 3-12B Nimmer on Copyright § 12B.06[A].

[34] McInerney MSJ Decl., ¶ 9, Exhibit 2.

7. **A "Fair Use" Defense for the Use of Thumbnails Is Appropriate Under *Kelly*.**

Apparently, Perfect 10's only argument as to why the rule in *Kelly* should not allow a fair use defense to the use of thumbnail images is the manner in which the thumbnails are used. Perfect 10 completely ignores the fact that, contrary to its assertion, thumbnails cannot "completely substitute for Perfect 10's copyrighted works."[35] Perfect 10 avoids the undisputed fact that the thumbnails on GUBA's Web site cannot be enlarged without a loss of resolution rendering them unintelligible. This is the rationale used by the *Kelly* court to conclude that the thumbnails cannot be a substitute for full-sized images.[36]

8. **Conclusion**.

Perfect 10's only defense to GUBA's summary judgment is a rhetorical one. It argues that because GUBA has no relationship with a primary infringer who engaged in the infringing activity at its root, GUBA itself must somehow be the primary infringer. This makes no sense. The fact that there is no link between an on-line service provider and the person initiating the infringing activity at the root level cannot cause the on-line service provider to be attributed the role of the primary infringer. Alternatively, Perfect 10 also summarily concludes that GUBA must be liable for direct infringement because copies of its material found its way to GUBA's Web site. The argument is anemic in that it completely sidesteps the ruling in *Netcom*, and the example of how *Netcom* should be adapted to more modern and realistic circumstances as done by the *CoStar* court. Nor has Perfect 10 raised a triable issue of fact as to GUBA's knowledge. GUBA could not have had any knowledge that the newsgroups that it archived contained Perfect 10 images absent notification. Accordingly, GUBA's Motion for Summary Judgment should be granted.

DATED: _____, 2002          LAW OFFICES OF SHELLEY M. LIBERTO

BY: _____
    SHELLEY M. LIBERTO
Attorneys for Defendants GUBA LLC, a Delaware Limited Liability Company; THOMAS G. MCINERNEY, JR.; and ERIC LAMBRECHT

---

[35] Perfect 10 Opp. at 23:8.

[36] Lambrecht MSJ Decl., ¶ 12; GUBA MSJ, 24:19-22, 25:1-19.

# CERTIFICATE OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 3 Hutton Centre, Suite 900, Santa Ana, CA 92707.

On December 6, 2002, I caused the foregoing document to be served, described as: **GUBA'S REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT** on interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

Ronald L. Johnston
ARNOLD & PORTER
1900 Ave. of the Stars, 17th Fl.
Los Angeles, CA 90067

**Attorneys for Plaintiff**

[ ]  BY MAIL. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the United States Postal Service on the same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

[ ]  BY FEDERAL EXPRESS. I am readily familiar with the firm's practice of collection and processing correspondence for mailing via Federal Express. Under that practice it would be deposited with Federal Express on the same day in the ordinary course of business and delivered the next day.

[X]  BY PERSONAL DELIVERY. I caused such envelope to be delivered by hand to the addressee(s) listed above.

[ ]  BY FACSIMILE. I caused such document to be faxed to the addressee at the number indicated above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 6, 2002, at Santa Ana, California.

_____
Jeanette J. Piazza

G:\GUBA\PLD\MSJ-REPLY.wpd